Compiler



SUPERIOR COURT
OF GUAM

'013 OCT -2 PM 1: 36



## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| GEORGE E. PTACK,<br><br>               Plaintiff,<br><br>     v.<br><br>JOYCE PTACK<br>aka JOYCE GUNDERSON,<br><br>               Defendant. | DOMESTIC CASE NO. DM0207-10<br><br><br>**FINDINGS OF FACT &<br>CONCLUSIONS OF LAW** |

## INTRODUCTION

This matter came before the Honorable Arthur R. Barcinas on September 26, 2012, December 03, 2012, and December 04, 2012 for the bench trial for the dissolution of marriage. The issues addressed during trial were the nature and distribution of marital and separate property and debt. Attorneys William B, Jones, Esq. and Anthony R. Camacho, Esq. represented the Defendant, JOYCE PTACK (GUNDERSON). Attorney Daniel S. Somerfleck, Esq. represented the Plaintiff, GEORGE PTACK. The Court heard testimony from both parties and now issues the following written Findings of Fact.

## FINDINGS OF FACT

After hearing testimony and taking evidence from the parties on the above-mentioned issues, the Court finds that the following facts were established by a preponderance of the evidence.

## STATISTICAL FACTS

1.      Plaintiff filed a Complaint for Dissolution of Marriage on March 25, 2010. Defendant filed her Answer to Complaint for Dissolution of Marriage and Counter-Claim for Divorce on May 28, 2010. Plaintiff filed his reply to Counterclaim on July 27, 2010.

2.      Plaintiff and Defendant were married on March 07, 2003 in Belund, Denmark.

3.      The Parties separated on April 07, 2010.

4.      The Parties lived together as husband and wife for approximately seven (7) years and one (1) month. They have not yet been granted a Decree of Divorce and have now been married for approximately nine (9) years and nine (9) months.

5.      There are no children of the marriage.

## MARITAL INCOME

6.      Prior to and during the marriage, Defendant has been employed with the Department of Defense Education System as a teacher.

7.      Plaintiff testified that aside from a seven (7) to eight (8) month period of employment as a corporate pilot, he had been in retirement and not employed. Defendant testified that during this employment period, he made approximately $92,000.00.

8.      The parties' joint income prior to separation was presented to the Court through testimony and the admission of exhibits. Defense Exhibit AA was admitted summarized the joint income of the parties as presented by annual tax documents contained in Joint Exhibits 11 thru 18. All admitted during the trial, Joint Exhibits 11, 12, 13, 14, 15, 16,

17, and 18 were tax filings for 2003, 2004, 2005, 2006, 2007, 2008, 2009, and 2010 respectively. Said Joint Income was as follows:

| YEAR | JOINT INCOME |
|------|------|
| 2003 | $165,882 |
| 2004 | $243,649 |
| 2005 | $159,441 |
| 2006 | $151,843 |
| 2007 | $163,494 |
| 2008 | $176,013 |
| 2009 | $161,011 |
| 2010 | $168,301 |

Def. Ex. AA; see also Joint Ex. 11-18.

## MARITAL PROPERTY

9.    Arizona Townhouse: 9705 E Mountain View #1164

a.    Plaintiff testified that the Arizona Townhouse was purchased before the marriage for $172, 000.00. He further testified that approximately two (2) months after the parties were married a transfer of title was executed effectively adding both spouses to the title to the Arizona Townhouse. Joint Exhibit 5, which was admitted into evidence at trial, is a Warranty Deed designating the Arizona Townhouse as Community Property with Right of Survivorship.

b.    Defendant noted that at the date of separation, approximately $90,000.00 was still owed on the property. Joint Exhibit 6, which was admitted into evidence at trial,

contains an email dated January 16, 2012 from Rand A. Rose, a Scottsdale, estimating the then-current value of the Arizona Townhouse to be $240,000.00.

c. Plaintiff noted that the mortgage is approximately $800.00 per month and the Home Owners' Association Fees are approximately $340.00 per month.

d. Defendant never lived in this home.

10. Arizona Lake House: 10102 Cochise

a. Plaintiff testified that the parties purchased the Arizona Lake House in 2004 for approximately $625,000.00. Plaintiff went on to state that both parties were on the deed.

b. According to the Plaintiff's testimony, the Arizona Lake house was sold in 2012 with the anticipated closing to occur on November 05, 2012. The property sold for $625,000.00 with approximately $468,000.00 being owed at the time of sale. Approximately $103,000.00 worth of proceeds from the sale of the Lake House remains in an escrow account.

c. Plaintiff testified that up until August 2007 expenses for this property were taken from the parties' joint accounts.

d. After the parties separated, Defendant contributed to (1) Pool care, (2) Home Owners' Association Fees, and (3) Miscellaneous Maintenance.

11. Northfield, Minnesota

a. Defendant testified that both parties are on the title to the Northfield, Minnesota home located at 1236 East Woodley Street, Northfield, Minnesota 55057. See also Joint Exhibit 4.

b. Testimony by the Defendant represented that the current note on the home is approximately $115,000.00 with monthly mortgage payments amounting to roughly $857.21 per month. See also Joint Exhibit 4.

c. According to Defendant, the property was purchased on or about August 2009 for approximately $180,000.00 and is currently valued at about $160,000.00 to $180,000.00. see Joint Exhibit 4.

d. The property has never been rented. Defendant makes payment on the property.

12. Los Osos, California Property

a. Defendant testified that both parties are on the title of the property. The parties currently hold title as husband and wife as joint tenants. Joint Exhibit 3.

b. Defendant testified that the current note on the property is approximately $225,000.00 with monthly mortgage payments amounting to approximately $1,700.00 per month.

c. The property is currently being rented for approximately $1,300.00 per month.

d. Defendant testified that the current value of the property is approximately $300,000.00 to $320,000.00 and this value is essentially equal to the value at the time of separation.

e. The difference between the monthly mortgage payments and the monthly rental income is approximately $500.00 per month.

f. Plaintiff testified at trial that he did not contribute to the care, maintenance, or mortgage of the properties in California. He went on to state that Plaintiff incurs all payments. Said property was the Defendant's prior to marriage.

13. Timeshares in Lake Tahoe and Phuket, Thailand.

a. Defendant testified that both timeshares were valued at approximately $21,000.00

b. Both parties testified that Plaintiff would receive the Phucket, Thailand Timeshare and Defendant would receive the Lake Tahoe Timeshare.

MARITAL EXPENSES

14. Plaintiff and Defendant testified to the numerous expenses incurred by both parties during the marriage.

a. NEA Members Benefit Credit Card (Account Ending in 4113)

i. During trial, admitted into evidence was Joint Exhibit 19 a compilation of credit card statements for NEA Members Benefit Credit Card account ending in 4113 and Defense Exhibit BB a summary of those statements.

ii. Between June 06, 2003 and July 07, 2004, although $13,455.71 in purchases were made, $5,134.25 of those charges were community expenses. Def. Ex. BB.

b. Citi Advantage World Mastercard (Account Ending in 8820)

i. During trial, admitted into evidence were Joint Exhibit 21 credit card statements for Citi Advantage World Mastercard account ending in 8820 and Defense Exhibit CC a summary of those statements.

ii. Between October 21, 2008 and August 18, 2010, although $28,122.04 in purchases was made, $3,840.31 of those charges were community expenses. Exhibit CC.

    c. American Express Credit Card (Account Ending in 01005)

i. During trial, admitted into evidence was Joint Exhibit 24 which was credit card statements of American Express Credit Card account ending in 01005 and Defense Exhibit DD a summary of those statements.

ii. Between 2009 to 2010, although $7,217.44 in purchases were made, $4,495.97 of those charges were community expenses. Exhibit DD.

    d. World Perks Visa Credit Card (Account Ending in 3309)

i. During trial, admitted into evidence was Joint Exhibit 20 credit card statements for World Perks Visa Credit Card account ending in 3309 and Defense Exhibit EE a summary of those statements.

ii. Between May 15, 2003 to October 15, 2008, although $53,607.86 in purchases were made, $37,026.52 of those charges were community expenses. Exhibit EE.

    e. Chase Credit Card (Account Ending in 5754)

i. During trial, admitted into evidence was Joint Exhibit 22 credit card statements for Chase Credit Card account ending in 5754 and  Defense Exhibit EE a summary of those statements.

ii. In 2010, although $10,345.67 in purchases were made, $2,493.96 of those charges were community expenses. Exhibit EE.

    f. U.S. Bank (Account Ending in 5675)

i. During trial, admitted into evidence was Joint Exhibit 25 a collection of statements for U.S. Bank Checking account ending in 5675 and Defense Exhibit GG, a summary of those statements.

ii. Between 2003 to 2007, Defendant's contributions to the account amounted to $240,480.00 while her expenses totaled $136,911.70. Def. Ex. EE. The Difference between Defendant's contributions and expenses is a surplus of approximately $103,567.00. Def. Ex. EE.

iii. Between 2003 to 2007, Plaintiff's contributions to the account amounted to $427,849.00 while his expenses totaled $579,001.30. Def. Ex. EE. The Difference between Plaintiff's contributions and expenses is deficit of approximately $151,152.30. Def. Ex. EE

g. Community Checking Account (Japan Account)

i. Defendant testified that while living in Germany, Japan, and Guam, the parties opened local or community-based checking accounts wherein Defendant's separate property income generated by separate property rental would be deposited.

ii. During trial, admitted into evidence was Joint Exhibit 26 a check registry for the Japan Community Checking account and Defense Exhibit HH, Defendant's summary of those registry documents.

iii. Defendant's contributions to the account amounted to approximately $18,000.00 per year while her expenses totaled $16,896.43. Def. Ex. HH. Defendant's withdrawals and expenditures against this account did not exceed her contributions. Def. Ex. HH.

iv. Plaintiff's contributions to the account amounted to $75,725.00 while his expenses totaled $106,928.30. Def. Ex. HH. The Difference between Plaintiff's contributions and expenditures against this account is a deficit of approximately $31,203.30. Def. Ex. HH.

h. Community Checking Account (Guam Account)

i. Defendant testified that while living in Germany, Japan, and Guam, the parties opened local or community-based checking accounts wherein Defendant's separate property income generated by separate property rental would be deposited.

ii. During trial, admitted into evidence was Joint Exhibit 27, a check registry for the Guam Community Checking account, and Defense Exhibit II, a summary of those registry documents.

iii. Defendant's contributions to the account amounted to approximately $18,000.00 per year. Def. Ex. II.

iv. Plaintiff did not contribute to this account. Def. Ex. II. Plaintiff did write a total of $13,005.00 of checks to himself. Def. Ex. II. Plaintiff's other expenditures against this account totaled $9,967.20. Def. Ex. II.

i. Defendant incurred all the housing costs up to separation. Defendant testified that these costs were deducted from her salary. During trial, admitted into evidence was Defense Exhibit QQ. For each full year of marriage Defendant incurred approximately $35,000.00 in housing costs. Def. Ex. QQ. From 2003 to 2007, this amounted to $153,000.00. Def. Ex. QQ.

PLAINTIFF's INVESTMENT INCOME

15.     During the marriage Plaintiff maintained several investment accounts that have been retained since separation.

a. American Century Investment Account (Account Ending in 3443)

i.  During trial, admitted into evidence was Joint Exhibit 29 statements for American Century Investment account ending in 3443 and Defense Exhibit JJ, a summary of said statements.

ii.  Plaintiff's investment account increased in value over the course of the marriage and as of December 31, 2010 was valued at $50,180.19.  Exhibit JJ.

iii.    Between 2003 and 2010, marriage to separation, this investment account accrued $9,194.81.

b. DWS Account (Account Ending in 1854)

i.  During trial, admitted into evidence was Joint Exhibit 30, statements of DWS account ending in 1854 and Defense Exhibit KK, a summary of those statements.

ii.  Plaintiff's investment account increased in value over the course of the marriage and at the end of 2011 was valued at $1,774.85.  Exhibit KK.

iii.  No statements were available prior to 2006 nor for 2010.  Between 2006 and 2011, this account accrued $135.15.

c. Scudder Account (Account Ending in 1854-1)

i.  During trial, admitted into evidence was Joint Exhibit 31 statements of Scudder account ending in 1854-1 and  Defense Exhibit LL, a summary of said statements.

    ii.  At the end of 2005, Plaintiff's investment account was valued at $1,565.76. Exhibit LL.

    iii.  No statements were available after 2005.

d.  Fidelity Investment Portfolio

    i.    During trial, admitted into evidence was Joint Exhibit 32, statements of Plaintiff's Fidelity Investment Portfolio, and Defense Exhibit MM, a summary of said statements.

    ii.  At the end of 2010, Plaintiff's investment portfolio was valued at $158,961.35. Exhibit MM.

e.  E-Trade Account (Account ending in 4902)

    i.  During trial, admitted into evidence was Joint Exhibit 33, statements for E-Trade account ending in 4902, and Defense Exhibit NN, a summary of those statements.

    ii.  No statements were available prior to 2006. From 2006 through 2010, this account increased by $256.28. At the end of 2011, Plaintiff's E-Trade Account was valued at $59,398.70. Exhibit NN.

f.  ING Direct Accounts (Accounts ending in 1870 and 3970)

    i.  During trial, admitted into evidence was Joint Exhibit 34, statements for ING Direct Accounts ending in 1870 and 3970, and Defense Exhibit OO, a summary of those statements.

    ii.  At the end of 2010, the account ending in 1870 designated as "TerryJoyce" was valued at $0.00. Exhibit OO. At the end of 2011, the account ending in 3970 designated as "Townhouse" was valued at $27,456.13. Exhibit OO.

iii. No statements were available prior to 2005. The "TerryJoyce" Account has a zero-balanace by 2010. In 2006, that account had $48,301.24. The "Townhouse" Account increased by $6,470.28 between 2006 and 2011.

g. Vangaurd Accounts (Accounts ending in 3820 and 7348)

i. During trial, admitted into evidence was Joint Exhibit 36, statements for Vangaurd Accounts ending in 3820 and 7348, and Defense Exhibit PP, a summary of those statements.

ii. At the end of 2011, the account ending in 3820 was valued at $116,630.40 and the account ending in 7348 was valued at $33,105.37. Exhibit PP.

iii. Between 2003 and 2010, account ending in 3820 increased in value by $26,657.82. Between 2003 and 2010, account ending in 7348 increased by $26,147.21.

DEFENDANT's RETIREMENT

16. Defendant's Thrift Savings Plan: During her testimony, Defendant approximated that the total contributions made to her Federal Thrift Savings Plan from marriage to the date of separation was about $50,000.00. Defendant noted that these contributions were made pursuant to her employment with the DoDEA.

PERSONAL PROPERTY

17. Personal Property

a. Safety Deposit Box

i. Plaintiff testified that he was in possession of the items located in the Scottsdale, Arizona Safety Deposit Box.

ii. Defendant claims ownership to the following items that were in the safety deposit box. Plaintiff has acknowledged possession of said items and in his examination, provided valuations to said items:

(A) Sapphire Ring with Diamond (Approximate Value $1,500.00 to $2,000.00)

(B) Blue Topaz Ring with Pendant (Approximate Value $1,500.00 to $2,000.00)

(C) Diamond Necklace

(1) Insured at $12,000.00 to $14,000.00

(2) Plaintiff had given the necklace to Defendant as a Birthday Gift

(3) Plaintiff testified that the Gem embodied within the necklace was from a ring owned by Plaintiff's grandfather.

(4) Plaintiff contends that the necklace was to go to Defendant for her life and upon her death go to his (Plaintiff's) son.

b. Testimony of the Parties alluded to the following significant pieces of household goods needing to be addressed:

i. Plaintiff testified to the approximate valuation of the following items to be around $5,000.00 to $6,000.00:

(A) Rosewood Alter Table

(B) Japanese Bookshelf

(C) Oil Painting

(D) Cuckoo Clock from Germany

    ii.  Dining Set (Approximate Value:$3,000.00)

    iii.  Gold Embossed Cabinet (Purchased in Japan)

    iv.  Japanese Drum

    v.  Wall Divider (Purchased on Guam; Approximate Value $300.00 to $400.00)

    vi.  German Trunk (Currently in the possession of Plaintiff)

    vii.  Leather Living Room Set (Approximate Value $2,000.00)

    viii.  English Table (Purchased in Germany)

    ix.  Black Lacquered Cabinet

18.    Agreements

i. Defendant testified that the prior to the purchase of the Arizona Lake House, the parties had agreed to sell both their existing retirement home in order to purchase the joint property. Defendant was to sell her Minnesota home and Plaintiff was to sell his Arizona Townhouse. As noted above, Defendant did in fact sell her first Minnesota retirement home with said funds going to the purchase of the Arizona Lake House. Although Plaintiff did place Defendant on the title of the Arizona Townhouse, Plaintiff never sold the Arizona Townhouse and said property is still within the community.

ii. Defendant testified that the parties had agreed that although Plaintiff managed the joint accounts, any funds spent from Defendant's separate or retirement funds would be reimbursed by Plaintiff. Defendant testified that she was led to believe that these monies were withdrawn and deposited/replaced into an account meant for her eventual retirement. Defendant notes that after separation she discovered that no funds were in the retirement accounts she assumed were available for her retirement.

iii. Defendant also disclosed that other expenses such as cable, Plaintiff's cellular service bill, and other expenses would be paid for by Plaintiff since Defendant was handling the major housing costs. Defendant testified that she had to incur much of these costs or they were paid using her separate or salary monies.

19. Defendant testified that since separation she undergoes therapy pursuant to the events surrounding her marriage to the Plaintiff. Defendant began therapy in 2009 on Andersen Air Force Base and continues to the present time.

20. Admitted into evidence was Defense Exhibit RR, two diagrams that illustrate and generally summarize the income and expenditures of the community during the marriage

## CONCLUSIONS OF LAW

### I.    GROUNDS FOR DIVORCE

Guam's divorce law provides for an equal division of property in divorces rendered on any ground other than that of adultery or extreme cruelty. 19 G.C.A. §8411(b). If the decree be rendered on the ground of adultery or extreme cruelty, the community property shall be assigned to respective parties in such proportions as the court, from all the facts in the case, and the condition of the parties, may deem just. 19 G.C.A. § 8411(a). Extreme cruelty is defined as the wrongful infliction of grievous bodily injury, or grievous mental suffering, upon the other by one party to the marriage. 19 G.C.A. § 8205. The Supreme Court of Guam has recognized that the trial court has "broad discretion" to divide community assets in any fashion which complies with the divorce statute. Navarro v. Navarro, 2000 Guam 31, ¶8. The burden is with the party who seeks the division of community property or debt. Id. at ¶9. Therefore, Defendant has the burden of proving that the marital property should be divided pursuant to 19 G.C.A.§§ 8205 and 8411, on the ground of extreme cruelty.

Defendant has demonstrated that she suffered extreme cruelty during the marriage. Mental cruelty is a course of unprovoked, offensive conduct which results in humiliation and anguish, and makes a spouse's life miserable and unendurable. Sablan v. Perez, DM1004-93, Decision and Order (Maraman, December 22, 1994), citing Rittmeyer v. Rittmeyer, 438 N.E.2d 237 ( Ill. App. 5th Dist., 1982). An action for divorce on the basis of "extreme cruelty is not insufficient merely because it alleges only acts of cruelty committed subsequent to final separation of husband and wife." Stitt v. Stitt, 65 P.2d 1297, 1298 (Cal. 1937).

Here, Defendant has proven that she has suffered extreme cruelty at the hands of Plaintiff. Defendant testified that she was led to believe that Plaintiff was managing both community and Defendant's separate funds for her eventual retirement. Defendant noted that at the beginning of the marriage Plaintiff did set up accounts she believed were for her retirement. After the parties separated, Defendant discovered that these accounts were depleted or significantly drained of their respective monies. Defendant disclosed during testimony that this came as a surprise as she thought her retirement was being managed by Plaintiff. During the marriage, Defendant had incurred almost all cost of the basic community expenses. These included housing, utilities, food, and the like. The evidence presented at trial reveal that despite Defendant's significant undertaking for the community to which her entire teacher's salary and a good majority of her separate income were dedicated, Plaintiff withdrew and exhausted more than he was contributing to the community assets.

Between 2003 to 2007, Defendant's contributions to the U.S. Bank Checking Account amounted to $240,480.00 while her expenses totaled $136,911.70. Def. Ex. EE. The Difference between Defendant's contributions and expenses is a surplus of approximately

$103,567.00. Def. Ex. EE. During this same period Defendant had approximately $153,000.00 deducted from her salary to cover the cost of housing for the parties. Def. Ex. QQ. Defendant's separate assets, namely the funds generated by her rental income, were also expended to support the community and for Plaintiff's separate liabilities. For example, Defendant's rental income was deposited into a community (local) bank account on Guam. Def. Ex. II. Although Plaintiff did not contribute to this account, Defendant discovered that he wrote a total of $13,005.00 in checks to himself. Def. Ex. II. Plaintiff's other expenditures against this account totaled $9,967.20. Def. Ex. II.

During this same 2003 to 2007 time-frame, Plaintiff's contributions to the U.S. Bank Checking account amounted to $427,849.00 while his expenses totaled $579,001.30. Def. Ex. EE. The Difference between Plaintiff's contributions and expenses is a deficit of approximately $151,152.30. Def. Ex. EE. Despite this exhaustion of community assets, Plaintiff's separate investment accounts and investment portfolios were maintained. See Def. Ex. JJ - Ex. PP.

Prior to the parties marrying, Defendant had significant amounts of assets attained for the purpose of retirement. Defendant testified that her prospective retirement date was between 2007 to 2010. After the parties separated, Defendant discovered that Plaintiff did not manage her retirement assets as Plaintiff had represented he would. Defendant notes that as of this 2012 trial, she is unable to retire and must rebuild what was loss during the marriage.

Defendant disclosed during trial that since the parties separated, she has had to undergo therapy to process and cope with the events occurring during the marriage and the aftermath of Plaintiff's extreme and cruel behaviors. Since 2009, over three years, Defendant has undergone this clinical intervention to manage the consequences of the Plaintiff's actions.

Based on the evidence presented at trial, the Court finds that Defendant endured and continues to endure grievous mental suffering due to Plaintiff's actions. The Court hereby grants a dissolution of the marriage on the ground of extreme cruelty in favor of the Defendant.

II.     DIVISION OF COMMUNITY PROPERTY AND DEBTS

Community property is defined as "property acquired by either spouse during the marriage which is not separate property. 19 GCA § 6101(b). Separate property is property acquired by either spouse before the marriage. 19 GCA § 6101(a)(1). Apportionment is used when a trial concludes that property contains both separate and community interest. Hart v. Hart, 2008 Guam 11, ¶38. Apportionment and apportionment method equations define the community's interest in the mixed property. Id. A trial court, when dissolving a marriage, determines what property is separate or community property. Id. at ¶24.

Under Guam law, community property is different than community debt. compare 19 GCA § 6101 with 19 GCA § 6102. Loans acquired during a marriage constitute community debt. Community debt is "debt contracted or incurred by either or both spouses which is not separate debt." 19 GCA § 6102 (b). The method of using capital appreciation and equity best credits the amount given from separate property for the original contribution, and best credits the role the original separate asset played in creating the equity in the home/real property. In re Marriage of Moore, 28 Cal.3d 366, 374 (Sup.Ct.Cal.1980).

1. ARIZONA TOWNHOUSE

The Arizona Townhouse located at 9705 E Mountain View #1164 was purchased before the marriage for $172, 000.00.  Plaintiff testified that approximately two (2) months after the parties were married a transfer of title was executed effectively adding both spouses to the title to the Arizona Townhouse.  A Warranty Deed designates the Arizona Townhouse as

Community Property with Right of Survivorship.. At the time of separation approximately $90,000.00 was still owed on the property. As of January 16, 2012, the estimated value of the Arizona Townhouse was purported to be $240,000.00.

Assuming that the value of the property at the time of separation was substantially similar to the current January 16, 2012 value, the equity in the home owned by the community is approximately $150,000.00. The Court finds that the parties each own a 50% interest in the homes equity. Should the value at the time of separation be as it was on January 16, 2012, then each party shall be entitled to $75,000.00 each. Due to the Court's finding that extreme cruelty on the part of the Plaintiff forms a basis for the dissolution, the Court will order that the Defendant is entitled to all the equity interest in the Arizona Townhouse.

## 2. ARIZONA LAKE HOUSE

The Guam Supreme Court has held that when husband and wife take title as joint tenants an inference of a gift of the funds used to acquire the property arises. Babauta v. Babauta, Guam, 2011 Guam 15, ¶25. This presumption may be rebutted. Id. Tracing alone to separate property funds is not sufficient in and of itself to rebut this presumption. Id.

Defendant seeks reimbursement for her separate property contribution to the purchase of the Arizona Lake House. Defendant testified that $94,000.00 worth of proceeds from the sale of her pre-existing Minnesota home went to the purchase of the Arizona Lake House. Although there is an inference or presumption that separate property contributions are gifts to the community, Defendant's testimony established the contrary intent that her $94,000.00 was a gift. Defendant explained that the parties had agreed to sell their pre-existing homes. Defendant sold her home and availed the community of a tax exchange to convert the proceeds of sale to a down payment on the Lake House. Although Defendant's name was

subsequently placed on the title of the Plaintiff's Townhouse, the Plaintiff never sold his Arizona Townhouse. Defendant testified that throughout the time the parties were together she advocated for the sale of the Townhouse. Indicative of Defendant's contrary intent to gift the funds is the 2009 purchase of a second Minnesota home in Northfield, Minnesota. This 2009 purchase evidences Defendant's desire to replace the first Minnesota home since the expectations and considerations of its sale were never procured. These expectations were testified to by Defendant during the trial. Expecting something in return is in congruent with the concept of gifting. Therefore, the Court finds that the Defendant did not intend for the $94,000.00 worth of separate property proceeds to be a gift. Plaintiff has traced the contribution to a separate property source and has sufficiently rebutted the presumption that the contribution was a gift.

Plaintiff also made smaller contribution to the Lake House down payment testifying that those funds were separate property assets. Because no evidence was presented to even trace these funds let alone rebut the presumption of a gift, the Court finds that Plaintiff intended this to be a gift.

Therefore, Defendant has offered sufficient evidence to rebut the presumption that her $94,000.00 contribution subsequent to the sale of her first Minnesota home was a gift. Plaintiff fails to rebut this presumption as to his contribution. The Court finds that the Defendant is, at the minimum, entitled to reimbursement in the amount of her separate property contribution or approximately $94,000.00. The Court further finds that based on its finding of extreme cruelty, Defendant is also entitled to be placed back where she was prior to marriage. This is that Plaintiff shall be entitled to the current value of the Minnesota home that was sold. This amount is approximately $200,000.00

## 3. MINNESOTA PROPERTY AND LOS OSOS, CALIFORNIA PROPERTY

Property held by spouses as co-tenants in joint tenancy is separate property. 19 G.C.A. § 6101 (a)(8); see <u>Babauta v. Babauta</u>, 2011 Guam 15, ¶26. By taking title to the residence as joint tenants, there is a rebuttable presumption that the separate property asset used to acquire the property was a gift to the community. Babauta, 2011 Guam 15, ¶26. Mere tracing is not sufficient to rebut the presumption. Id.

The parties both testified that although both names are on the titles, Defendant bears the sole responsibility of maintaining these properties. No other contribution is alleged by the Plaintiff. Defendant brought the California property into the marriage. Although purchased during the marriage, both parties assert that Defendant has paid all costs. Because the Court finds there is grounds to grant the divorce on extreme cruelty, both the Los Osos, California property and the Minnesota property shall be granted to Defendant.

## 4. TIMESHARES

Both parties testified that Plaintiff would receive the Phucket, Thailand Timeshare and Defendant would receive the Lake Tahoe Timeshare.

## 5. HOUSEHOLD GOODS AND PERSONAL PROPERTY

### a. Jewelry

It was testified at trial by both parties that the Plaintiff gifted the jewelries contained in the Arizona safety deposit box to the Defendant. Plaintiff testified that he was in possession of the items located in the Scottsdale, Arizona Safety Deposit Box. Plaintiff provided valuations. The Court finds that the Defendant is entitled to these items. They are (1)

Sapphire Ring with Diamond (Approximate Value $1,500.00 to $2,000.00); Blue Topaz Ring with Pendant (Approximate Value $1,500.00 to $2,000.00); and Diamond Necklace.

b. Household Goods

Testimony of the Parties alluded to the following significant pieces of household goods needing to be addressed:

i. Plaintiff testified to the approximate valuation of the following items to be around $5,000.00 to $6,000.00:

(A) Rosewood Alter Table

(B) Japanese Bookshelf

(C) Oil Painting

(D) Cuckoo Clock from Germany

ii. Dining Set (Approximate Value:$3,000.00)

iii. Gold Embossed Cabinet (Purchased in Japan)

iv. Japanese Drum

v. Wall Divider (Purchased on Guam; Approximate Value $300.00 to $400.00)

vi. German Trunk (Currently in the possession of Plaintiff)

vii. Leather Living Room Set (Approximate Value $2,000.00)

viii. English Table (Purchased in Germany)

ix. Black Lacquered Cabinet

At trial the parties were amicable to an equal division of said household goods.

7.    REIMBURSEMENT OF COMMUNITY FUNDS

Guam's community property statutes were initially modeled after California, but subsequent to the 1980 revisions our laws are congruent to New Mexico. Faria v. Faria, DM183-95, Decision and Order (Gatewood January 17, 1996). Under New Mexico law the community is entitled to an equitable lien against separate property to the extent that the community can show that its funds or labor enhanced the value of the property. Faria v. Faria, DM183-95, Decision and Order (Gatewood January 17, 1996) (citing Martinez v. Block, 858 P.2d 429, 431 (N.M. App. 1993)).

Defendant proved during trial that most of community expenses were paid for by her salary and separate property funds. Defendant also testified specifically to the parties' joint income tax filings. see Ex. AA and Joint Ex. 11-18. Defendant explained that due to the income from Plaintiff's investments the community incurred the debt to the tax agency. Plaintiff availed himself of the benefits of filing joint taxes wherein the community absorbed the impact of this investment income to its detriment and to the detriment of the Defendant. Defendant noted on the stand that her separate rental income was used to pay monies owed to the IRS. Thus, community and the Defendant's separate assets were used to manage and maintain the growth of the Plaintiff's investments and funds.

Plaintiff's investment income during the marriage was submitted to the court through testimony and exhibits. The income, profits, and gains over the course of the marriage are as follow: (1) American Century Investment Account increased by $50,180.19 (Ex. JJ and Joint Ex. 29); (2) DWS Account increased by $135.15 (Ex. KK and Joint Ex. 30); (3) E-Trade Account increased by $256.28 (Ex. NN and Joint Ex. 33); (4) ING Direct "Townhouse" Account increased by $6,470.28 (Ex. OO and Joint Ex. 34); (5) Vanguard Account ending in

3820 increased by $26,657.82 (Ex. PP and Joint Ex. 36); and (6) Vanguard Account ending in 7348 increased by $26,147.21 (Ex. PP and Joint Ex. 36). Therefore, from these accounts alone, Plaintiff's investments were enhanced over the course of the marriage by at least $109,846.93.

Defendant has proven that the community and her separate asset contributions have enhanced the value of Plaintiff's investment accounts. Although the Court finds that the Defendant is entitled to 50% of said enhanced value or $54,923.46, because the Court finds that the Defendant suffered extreme cruelty inflicted by the Plaintiff, Defendant shall receive the entirely of the gains or $109.846.93.

8.     REASONABLE ATTORNEYS FEES

Based on the Court's finding of extreme cruelty, Defendant is entitled to reasonable attorney's fees.

IT IS SO ORDERED this ___ day of October, 2013.

_____
**HONORABLE ARTHUR R. BARCINAS**
**Judge, Superior Court of Guam**

I do hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam

OCT 0 2 2013

Benny O. Cruz
Deputy Clerk Superior Court of Guam